1
2
3
4
5
6
7

8            UNITED STATES DISTRICT COURT

9           SOUTHERN DISTRICT OF CALIFORNIA

10  UNITED STATES OF AMERICA,          CASE NO. 14-cr-2141-GPC

11                        Plaintiff,   **ORDER DENYING DEFENDANT"S**
                                       **MOTION TO SUPPRESS**
12      vs.                            **EVIDENCE**

13
    EDUARDO GARCIA-GRIMSHAW,
14
                          Defendant.
15

16

17                      **INTRODUCTION**

18       On July 3, 2014, Defendant Eduardo Garcia-Grimshaw ("Garcia" or

19  "Defendant") was arrested following a traffic stop of his Nissan Sentra which was

20  followed by a canine alert on the vehicle and the discovery of approximately 31

21  kilograms of methamphetamine concealed in the vehicle. Defendant is charged in a

22  one-count information with possession of methamphetamine with intent to distribute.

23  On October 15, 2014, Defendant filed a motion to suppress evidence challenging the

24  traffic stop, canine sniff, search of his vehicle, seizure of his cell phone, his arrest, and

25  his post-arrest statement. A hearing on the motion was conducted on October 31, 2014,

26  November 12, 13 and 19, 2014 and December 2, 2014. Based on the papers filed,

27  testimony of the witnesses called and the exhibits admitted, the Court DENIES the

28  motion to suppress.

**FACTUAL BACKGROUND**

On the morning of July 3, 2014, Border Patrol Agent Kevin Caruthers was observing traffic from the northbound side of the I-15 freeway near Gopher Canyon Rd. in Fallbrook, CA. Agent Caruthers has been with the Border Patrol for 15 ½ years and has received specialized training in behavioral analysis and highway interdiction. Agent Caruthers was uniformed and operating a marked U.S. Border Patrol Tahoe and was traveling with his drug detecting canine "Lepra." Def. Mot. Ex. A at 1. The area is located 70 miles north of the border and is a "well-known and documented corridor used by illegal entrants and smugglers to transport their illicit cargo north into the interior of the United States." *Id*. Agent Caruthers had apprehended "numerous smuggling loads in recent months, many of which were intercepted along the I-15 smuggling corridor." *Id*.

On July 3rd at approximately 10:30 a.m., Garcia was driving north on I-15 in a silver Nissan Sentra, bearing California license plates. Agent Caruthers observed Garcia slow down causing the Nissan Sentra's nose to dip upon seeing Agent Caruthers parked on the side of the road. *Id*. Agent Caruthers described this as something the "majority of the motoring public" will do upon seeing a law enforcement vehicle. *Id*. However, Garcia did not speed back up upon approaching Agent Caruthers's car, which Agent Caruthers described as unusual. *Id*. In his experience, the majority of the motoring public will resume their previous speed after realizing the unit is a Border Patrol unit. *Id*. at 2.

Agent Caruthers also noticed Garcia was "sitting rigid [sic] and looking straight ahead, with both hands on the steering wheel." *Id.* Given these observations, Agent Caruthers entered the freeway to investigate further. When Agent Caruthers pulled alongside Garcia's car, Garcia placed one hand on the passenger seat and tapped his fingers on the headrest. *Id*.

As Agent Caruthers drove along side Garcia's vehicle, he noticed that Garcia's car was clean and free of any personal items. Agent Caruthers had previously seen

clean cars associated with smuggling because the load car does not necessarily belong to the driver so none of the driver's personal items are in the car. *Id.*

Record checks by Agent Caruthers revealed that the vehicle was registered to Carmen Grimshaw-Rivas of San Diego. *Id*. In addition, Agent Caruthers learned that the same Nissan Sentra had crossed from Mexico into the United States on July 2, 2014 at 9:02 p.m. at the Port of Entry ("POE") at San Ysidro. *Id.* Available photos revealed that Garcia himself drove the Nissan Sentra into the United States on July 2nd. *Id.* Records checks also disclosed that Garcia had crossed into the United States thru the Otay Mesa POE pedestrian lanes that morning at 9:33 a.m. *Id*.

Agent Caruthers found the crossing pattern of Garcia very suspicious. In his experience, load vehicles cross through a POE and park until the following day so that the load vehicle can avoid detection by blending in with traffic during normal traffic hours. *Id.*

When Agent Caruthers passed Garcia's vehicle, Garcia slowed down from 65 miles per hour to around 55 miles per hour. *Id*. Agent Caruthers testified that the average rate of speed for traffic at that time and stretch of road was between 75 and 80 miles per hour. Agent Caruthers believed that Garcia was trying to distance himself from Agent Caruthers by driving at a much slower rate of speed. *Id*. Agent Caruthers slowed down and waited for Garcia to pass him and then pulled behind Garcia's Nissan. At this time, Garcia "abruptly changed lanes" and unsafely crossed three lanes of traffic to exit at Mission Road. *Id*.

Based on these facts, Agent Caruthers activated his emergency lights and stopped Garcia. *Id*. Agent Caruthers contacted Garcia and asked him in English where he was going and why he had abruptly exited the highway. *Id*. at 2-3; Govt. Resp. Ex. A at ¶¶ 6-7. Garcia responded that "he was looking for a restroom," and "that he had to go really bad." Def. Mot. Ex. A at 3. Agent Caruthers then asked Garcia why he did not exit at the I-76 exit where a gas station is visible from the highway and there are signs for gas stations on the Freeway. Govt. Resp. Ex. 1 at ¶ 9. Garcia stated that he did

1  not know there was a restroom at the exit. *Id*.

2      Garcia claims that he told Agent Caruthers that he spoke Spanish and spoke a

3  little English. Def. Mot. Ex. D at 11. Meanwhile, Agent Caruthers stated that Garcia

4  answered his questions with no hesitation, spoke to Agent Caruthers in English, and

5  asked Agent Caruthers questions in English. Govt. Resp.Ex. 1 at ¶ 17. Agent Caruthers

6  asked Garcia where he was going and Garcia explained to Agent Caruthers that he was

7  on his way to Glendale for the July 4th holiday. Def. Mot. Ex. A at 3. Agent Caruthers

8  questioned Mr. Garcia about his border crossings. *Id.* Garcia claimed it had been

9  several days since he last crossed the border in the Nissan. *Id*.

10     A few minutes after the stop, Agent Caruthers asked Garcia for consent for a

11  canine sniff and hand search of the outside and inside of his vehicle. Govt. Resp. Ex.

12  1 at ¶ 11. Agent Caruthers explained to Garcia that the canine was trained to detect

13  drugs. In his declaration, Garcia states that he needed to use the restroom at the time

14  and did not understand exactly what Agent Caruthers was saying. Def. Motion Ex. D

15  at 12. Agent Caruthers testified that Garcia granted verbal consent. Garcia states that

16  he was not advised that he could refuse the hand or canine search and believed that he

17  had to allow the search. *Id*. Garcia who was not handcuffed or restrained, stepped out

18  of the car and stood nearby while Agent Caruthers retrieved his drug detecting dog.

19  Govt. Resp. Ex. 1 at ¶ 11. As Agent Caruthers walked Lepra towards Garcia's vehicle,

20  Lepra immediately alerted to the rear passenger door which was the first part of the

21  vehicle that she reached. *Id*. at ¶ 12. Afterwards, Agent Caruthers opened the rear door

22  to the vehicle and Lepra almost immediately indicated to the presence of drugs near the

23  back seat of the vehicle. *Id.* at ¶ 13.[1]

24     Following the canine alert and indication, Agent Caruthers informed Garcia of

25

26      [1] Agent Caruthers testified that Lepra alerts to the presence of concealed drugs
27  or humans by demonstrating excitability, i.e. wagging her tail rapidly and bouncing
    back and forth. Following an alert to the presence of drugs or humans, Lepra will
28  pinpoint the precise location of the drugs or humans by an "indication," i.e. sitting and
    staring at the location.

1   the canine alert and asked if there was anything illegal in the vehicle to which Garcia

2   replied "no." Def. Mot. Ex. A at 3. Agent Caruthers then asked Garcia if the vehicle

3   could be moved to the Temecula checkpoint so that a search of the vehicle could be

4   performed in a safe environment. Agent Caruthers stated that Garcia gave verbal

5   consent. *Id*. Meanwhile, Garcia asserts that he was told that the inspection of his

6   vehicle would continue at a point approximately five miles away. Def. Mot. Ex. D at

7   12. Agent R. Otero was called and responded as backup minutes later and Garcia

8   followed Otero's vehicle to the checkpoint with Agent Caruthers following Garcia's

9   vehicle.[2]

10       At the checkpoint, Garcia's cell phone was taken from him and he was placed

11   in the back seat of a locked law enforcement car. *Id*. at 13. Agent Caruthers testified

12   that Garcia's cell phone was taken to prevent the destruction of evidence or

13   photographing of law enforcement officers. A search of the vehicle revealed

14   methamphetamine under the carpet, under the driver's seat, in the center console, in the

15   four doors, and in the rear back seat of the Nissan Sentra. Garcia was advised of the

16   drug seizures and was arrested at 11:15 a.m. and transported to the Murrieta Border

17   Patrol station for processing. Garcia's declaration states that he was placed in a holding

18   cell where Agent Perez asked Garcia for his cell phone password. Garcia asserts that

19   while he was being fingerprinted Agent Perez was using his cell phone. *Id*. at 13.

20       At approximately 1:20 p.m., Garcia was provided and signed a consent form in

21   the English language for a search of Garcia's cell phone. Def. Mot. Ex. B. At 2 p.m.,

22   Agent U. Perez provided Garcia with a written acknowledgment and waiver of his

23   Miranda rights with a I-214 form in the Spanish language. Govt. Ex. 6. While Garcia

24   explained that he was fluent in both Spanish and English, Garcia stated his preference

25

26       [2] Garcia claims that two officers, including "Agent Perez," arrived at the stop location to assist Agent Caruthers in escorting Garcia's vehicle to the station. Def. Mot.

27   Ex. A at 12. Agent Caruthers states that Agent Miguel Perez did not respond to the stop site but did assist in the investigation at the Temecula station. Govt. Resp. Ex. 3 at ¶

28   16. Meanwhile, Agent Ubaldo Perez testified that he joined the investigation at the Murrieta station after Garcia was arrested.

          14-cr-2141-GPC

1  to have the interview in the Spanish language. Garcia waived his Miranda rights and

2  was interviewed by Agent U. Perez and Agent Otero in the Spanish language.

3  **1. The Stop of Garcia was Supported by Reasonable Suspicion**

4       The Fourth Amendment "applies to all seizures of the person, including seizures

5  that involve only a brief detention short of traditional arrest." *United States v.*

6  *Brignoni-Ponce*, 422 U.S. 873, 878 (1975). Accordingly, the Fourth Amendment

7  requires that such seizures be, at a minimum, "reasonable." *Id.* An investigatory stop

8  of a vehicle may be based upon a reasonable suspicion that criminal activity is afoot

9  upon an evaluation of the totality of the circumstances. *United States v. Arivizu*, 534

10 U.S. 266 (2002). The evaluation precludes a "divide-and-conquer analysis" because

11 even though each of the suspect's "acts was perhaps innocent in itself . . . taken

12 together, they [may] warrant [] further investigation." *Id*. at 274. The analysis allows

13 officers to draw on their own experience and specialized training to make inferences

14 from and deductions about the cumulative information available to them that might

15 elude an untrained person. *Id*.

16      Under *United States v. Brignoni-Ponce*, 422 U.S. at 884, a non-exclusive list of

17 factors a court may use in determining whether a stop and detention is lawful

18 includes: (1) characteristics of the area where vehicle encountered; (2) proximity to

19 border; (3) erratic or evasive driving; aspects of the vehicle; and (4) behavior of the

20 driver. Such facts must be filtered through the lens of the agent's training and

21 experience. *Id*. at 885.

22      The relevant factors in this case are as follows:

23      **A. Area Where Vehicle Encountered**

24      Agent Caruthers encountered Garcia at the I-15 corridor where 36 loads had been

25 discovered between May 2013 and October 2014. Five of those seizures had been made

26 by Agent Caruthers, including three seizures made by him earlier in 2014.

27      **B. Proximity to the Border**

28      Garcia was encountered on the I-15 corridor in an area approximately 70 miles

1   from the border.

2         **C. Aspects of the Vehicle**

3       The vehicle was registered to someone other than Garcia. It was also clean of any

4   personal belongings.

5         **D. Behavior of the Driver**

6       Agent Caruthers noticed that as he drove along side Garcia, Garcia began to tap

7   the passenger seat head rest. Agent Caruthers had encountered this same nervous

8   reaction when smugglers encounter law enforcement. Defense counsel explained that

9   Garcia could have been tapping his fingers to music on the radio. However, the

10   significance of Garcia's behavior is that his nervous behavior coincided with Agent

11   Caruthers driving alongside of Garcia's vehicle.

12       More importantly, Agent Caruthers had learned that Garcia crossed the same

13   vehicle into the United States the night before at the San Ysidro POE, returned to

14   Mexico, and reentered the United States approximately 12 hours later at the pedestrian

15   lanes of the Otay Mesa POE. In Agent Caruthers's experience, these actions were

16   consistent with the actions of drug smugglers who seek to blend in with the high

17   volume traffic that develops during the daytime.

18       Relying on *United States v. Montero-Camargo*, 208 F.3d 1122, 1131 (9th Cir.

19   2000) (en banc), Garcia argues that while his crossings into the United States are

20   particularized, warrantlessly stopping people because they recently crossed the border

21   is impermissible because it sweeps a huge number of people into a group devoid of

22   particularized suspicion. However, Garcia ignores the individual circumstances that

23   pointed to criminal behavior. It is not merely Garcia's crossing into the United States

24   that is significant, it is the number of crossings, types of crossings and timing of the

25   crossings which led Agent Caruthers to conclude that criminal activity was afoot. The

26   evidence shows that Garcia had crossed his vehicle at the San Ysidro POE twelve

27   hours before again reentering the United States at the pedestrian crossing at the Otay

28   Mesa POE. In Agent Caruthers's experience this followed a pattern engaged in by drug

1  smugglers who aim to avoid detection by blending in with a large number of vehicles

2  that travel during the business day. This conduct is particularized to Garcia and is not

3  shared by a substantial number of people.

4  **E. Driving of Garcia**

5  Agent Caruthers testified that Garcia slowed down and caused the front of

6  Garcia's vehicle to dip upon seeing Agent Caruthers's Border Patrol vehicle, and

7  continued to drive at a rate lower than the posted speed limit after being able to see that

8  Agent Caruthers's vehicle was a Border Patrol vehicle. Later, after Agent Caruthers

9  started to follow Garcia, Garcia "abruptly changed lanes" and unsafely crossed three

10  lanes of traffic to exit at Mission Rd. *Cf. United States v. Valdez-Vega*, 738 F.3d 1074,

11  1079 (9th Cir. 2013) (reasonable suspicion to stop where truck with foreign plates

12  engaged in erratic driving and change in speed in an area frequented by smugglers)

13  In Agent Caruthers's experience, smugglers will drive well below the speed limit

14  to create distance from law enforcement and will often abruptly exit off the highway

15  in an effort to lose law enforcement vehicles following them. Def. Mot. Ex. A at 2.

16  Garcia argues that even if the Court accepted Agent Caruthers's testimony, it could be,

17  as Garcia explained to Agent Caruthers, that he really needed to use the bathroom.

18  Garcia argues that his case is similar to a number of Ninth Circuit cases holding

19  reasonable suspicion was lacking. In *United States v. Rodriguez*, 976 F.2d 592 (9th Cir.

20  1992), defendant drove alone past Border Patrol agents, at 7:00 p.m. on Interstate 8 in

21  Southern California, in a car similar to one believed to be involved in a "smuggling

22  case at some unknown place and time." Defendant did not "acknowledge" the agents

23  who followed him and watched as he looked at them in his rear-view mirror and then

24  swerved within his lane. *Id.* at 593-94. Further, his car seemed "heavily loaded." *Id.* at

25  595. The *Rodriguez* court held that these factors describe too many individuals to

26  create a reasonable suspicion that this particular defendant was engaged in criminal

27  activity. *Id.* at 596.

28  In *United States v. Salinas*, 940 F.2d 392, 393 (9th Cir. 1991), a defendant drove

alone in a car, "of a type commonly used for drug and alien smuggling," at 8:35 a.m. on a state highway in Arizona about 70 miles from the border. The officer noticed that the car seemed "loaded down" and, when it passed a Border Patrol agent, the driver "glanced at him, prompting [the agent] to follow." *Id.* at 394. Record checks indicated that the car was from near a town with "a high concentration of drug and alien smuggling." *Id.* at 394.

The Court ruled that the stop was unlawful because: "thousands [of] Mexican males drive old model General Motors cars to work every morning. This . . . does not justify the random stopping of 'suspicious' looking cars because the officer knows that a substantial number of them will, indeed, be carrying contraband. Thousands of United States citizens of Mexican ancestry drive old model cars on perfectly legitimate errands [with items] weighing down the rear springs. A driver who glances at a border patrol car does not thereby become a suspicious character." *Id.* at 394-95.

In *Rodriguez* and *Salinas* the Ninth Circuit was vigilant in ensuring that conduct shared by thousands of people would not become the basis for traffic stops. In this case, the area where the vehicle was encountered, the proximity to the border, and the clean vehicle are generalized and provide little, if any, particularized suspicion directed at Garcia or his vehicle. On the other hand, evidence regarding Garcia's erratic driving is particularized and provides evidence of nervous behavior and consciousness of guilt. When these facts are considered with Garcia's unusual crossing history, specific and particularized facts supported the reasonable suspicion that Garcia was engaged in drug smuggling at the time he was stopped.

**2. Garcia Provided Consent for the Canine Sniff**

Garcia next challenges the canine sniff of his vehicle on the grounds that valid consent for a canine sniff was lacking. The Court finds that Garcia consented to a hand search and canine sniff and that, in any event, neither probable cause nor consent was necessary to justify the canine sniff conducted in this case.

In *Illinois v. Caballes*, 543 U.S. 405, 410 (2005), the U.S. Supreme Court held

that a dog sniff on the exterior of a vehicle does not require reasonable suspicion as long as the sniff was within the scope of a legal stop. *See also City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) (exterior sniff of an automobile is permissible, in part, because it does not require entry into the car). The Court has found that Agent Caruthers had reasonable suspicion to believe that Garcia was transporting drugs. After the traffic stop and brief questioning of Garcia, Agent Caruthers requested consent to perform a hand search and canine sniff. Afterwards, Agent Caruthers walked Lepra towards Garcia's vehicle, Lepra immediately alerted to the rear passenger door which was the first part of the vehicle that she reached. The alert occurred on the exterior of the vehicle and the canine did not touch the vehicle prior to alerting. Under *Caballes*, the canine sniff performed by Lepra did not require reasonable suspicion.

To the extent that consent was required for the canine sniff on the exterior or interior of the vehicle, the Court finds Garcia consented. First, Garcia claims that he spoke little English and did not understand exactly what Agent Caruthers was saying. However, Agent Caruthers testified that Garcia answered his questions with no hesitation, spoke to Agent Caruthers in English, and asked Agent Caruthers questions in English. Having observed Agent Caruthers's demeanor during his testimony, the Court finds that Agent Caruthers was a credible witness and credits his testimony. In addition, the Court finds that Agent Caruthers observations regarding Garcia's fluency in English are confirmed by the specific information that he elicited from Garcia through questions posed in the English language. *Cf. United States v. Perez*, 37 F.3d 510, 515 (9th Cir.1994) (rejecting defendant's claim that he did not understand the officers' request for consent when his answers to the officers' other questions were responsive).

Garcia claims that he was essentially told that the canine search was going to occur and that he was never told that he could refuse consent. The Court credits Agent Caruthers testimony that he requested permission to conduct a hand search and a canine sniff, and that Garcia consented.

In this case, there is nothing to suggest that Agent Caruthers exerted any overt coercion on Garcia to consent, or told him that he could secure a warrant if Garcia refused. *See United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir.1988). Nor was the situation inherently coercive: Garcia was not under arrest or physically detained at the time, and the agents did not have their guns drawn. *See id*. Garcia was briefly detained on a public highway, a setting held to actually discourage coercion. *See Berkemer v. McCarty*, 468 U.S. 420, 438 (1984). While Agent Caruthers did not give a Miranda warning, it was not required, since Garcia was not under arrest at the time. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 231-32 (1973) (failure to give Miranda warning does not render consent invalid if defendant is not subject of custodial interrogation). Viewing the totality of the circumstances, the Court concludes that Garcia's consent was voluntary. *See Gutierrez-Mederos*, 965 F.2d 800, 802-03 (9th Cir. 1992) (finding consent to be voluntary under similar circumstances).

Nor does the record indicate that Garcia objected, at the time, to the scope of the search or the use of a narcotics dog. "Failure to object to the continuation of a vehicle search after giving general consent to search 'is properly considered as an indication that the search was within the scope of the initial consent.'" *United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994) (quoting *United States v. Sierra-Hernandez*, 581 F.2d 760, 764 (9th Cir.), *cert. denied*, 439 U.S. 936 (1978)).

In this case, Garcia was initially stopped by an officer in a public setting. The evidence shows that weapons were never displayed and that Agent Caruthers asked for permission to run the dog on the outside and inside of the vehicle. While Garcia was not advised of the right to terminate the encounter, on balance, the Court finds that consent to have Lepra perform a canine sniff, to the extent that it was needed, was freely given.  Taking into account all of the circumstances surrounding his encounter with Agent Caruthers, the Court concludes that Garcia was not in custody at such time.

**3. Lepra's Alert Furnished Probable Cause to Search the Vehicle**

Garcia argues that even if the canine sniff was legal, Lepra was not properly

trained and asserts that the certification program was flawed so that Lepra's alert was not reliable and did not provide probable cause for a search of the vehicle.

**A. Facts Regarding the Training and Certification of Agent Caruthers and Lepra**

At the suppression hearing, Agent Caruthers testified that he has been a certified canine handler for eight years and has been assigned as a canine instructor for four years. Drug detecting canines with Border Patrol receive 16 hours of training per month. Lepra had received the 16 hours of training every month from January through June 2014 except May 2014 when Lepra received 8 hours. Besides regular training, Lepra and Agent Caruthers underwent bimonthly testing on an average of every two weeks.

In addition, the government called Agent Jerry Bobo as an expert witness. Agent Bobo is a Special Operations Supervisor with the Border Patrol and has been employed by Border Patrol for 22 years. He is the canine coordinator for 79 canine teams and was a certified canine handler from 1995 through 2010. He is a certified canine instructor with the North American Work Dog Association and the Narcotics Detector Dog Association. Agent Bobo has seen Lepra and her handler Agent Caruthers 25 times, and tested Lepra at roadside locations on five occasions.

In testing drug detecting canines, Agent Bobo explained that a rating system of 1-6 is utilized with 1 being the highest and 6 the lowest. A handler or canine score of 3.5 is acceptable and a score of 3 is average. In the case of Lepra, the performance scoring sheets disclosed that Lepra scored 2's on the vast majority of her manuevers and 3's on a few tested areas. An alert score of 1 is given when a dog instantaneously and accurately detects trained odors. A canine receives a score of 2 when the alert takes a few seconds. A score of 1 on an indication means no hesitation in tracking the precise source and a score of 2 means the canine followed the source in a matter of seconds. Agent Bobo opined that Lepra's alert was very reliable.

Agent Bobo acknowledged that cueing by a canine handler would result in an

alert that is not reliable. Agent Bobo testified that cueing of a drug detecting dog occurs when the canine handler consciously or subconsciously prompts the canine to alert. During training of the dogs, training measures to avoid cueing are utilized such as blind searches. A blind search is defined as a canine search where the handler is unaware of the presence or location of drugs and the judging instructor is aware of the location of the drugs but is outside the search area. According to Agent Bobo, written records of detector canine testing allow one to determine if a canine has problems with cueing. In Agent Bobo's experience, a dog that was prompt dependent would receive scores of 5 or 6. No cueing or prompting problems were noted with Lepar or Agent Caruthers.

In addition, Agent Bobo testified that Border Patrol utilized conflict materials, that is, different packaging materials (e.g. plastic, canvas, metal containers and wood box), as well as distractions such as food, in testing the canines. Variety was also employed as to the type of drugs and location of the searches.

Defendant called Steven Nicely as a witness. Nicely worked as a law enforcement canine handler more than 25 years ago and has not worked in law enforcement for more than 20 years. He received an associate degree in experimental psychology. At the private firm of Global Training Academy, he helped train approximately 750 dogs for law enforcement. He last trained a drug detecting canine in 2005 and last instructed canine handlers in 2006. Nicely is not currently certified as canine handler or trainer. Nicely has testified more than 90 times in state and federal court as an expert witness on the use of police dogs. He has never testified for the prosecution.

Nicely testified that he had reviewed the Border Patrol training documents, certification documents, and case reports for the Garcia case. He was also present at the suppression hearing during the direct and cross examination of Agent Caruthers. Based on this information, Nicely opined that Lepra was not a reliable detector dog. Nicely reported that key factors in a canine's work are the indication and whether the

dog is prompt dependent, that is, needs a cue from the handler. If a dog is prompt dependent then the dog's alert is not reliable. Nicely cited a 2011 article by Lisa Lit, Julie Schweitzer and Anita Oberhauer entitled "Handler's beliefs affect scent detection og outcomes." Def. Ex. P. In the study, handlers were falsely told that rooms in a church contained drugs or explosives when neither was present. In spite of the absence of drugs or explosives, 225 false alerts were made by the canines due to the handlers expectation that drugs or explosives were somewhere in the room. The essence of the article is that expectations of a canine handler will subconsciously cause the handler to cue a canine to a false alert. Nicely opined that there was a high probability of cueing by Agent Caruthers based on Dr. Lit's findings regarding the incidence of cueing. On cross examination of Nicely, he acknowledged that Lit's article had not been peer reviewed and was criticized for failing to review a canine's previous training records and failing to clear the church of contamination.

In Nicely's view, cueing could be avoided by reducing the expectations of handlers which was only possible by blind and double blind testing of the canines. Blind testing occurs when the handling officer is unaware of the presence or location of drugs, while double blind testing occurs when both the handler and tester are unaware of the presence or location of the drugs. Nicely opined that Border Patrol's certification records do not clearly verify the absence of cueing.

Nicely testified that Lepra's scores of 2 and 3 indicated some undisclosed type of flaw in her alert and indication. Nicely criticized the performance logs for failing to identify noticeable errors in order to take corrective actions to eliminate errors. Nicely was also critical of Border Patrol's failure to videotape Lepra's sniff of Garcia's vehicle.

## B. Lepra Was Properly Trained and Her Alert Was Reliable

Assuming a drug detecting dog is properly trained and that the traffic stop is not unlawfully prolonged, probable cause to justify a warrantless search is established when the dog alerts on a part of the car. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005).

Evidence of a dog's satisfactory performance in a certification or training program can itself provide a sufficient reason to trust its alert. *Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013). If a bona fide organization has certified a dog after testing its reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dogs alert provides probable cause to search. *Id*. The *Harris* court observed that a defendant in a dog-sniff case must be afforded the opportunity to challenge "evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses." *Id*. "The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty.[3] So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings." *Id*. However, the Supreme Court rejected the Florida Supreme Court's holding that the prosecution must in every case present an exhaustive set of records, including a log of the dog's performance in the field, to establish the dog's reliability. *See Harris v. State*, 71 So. 3d 756, 775 (Fla. 2011). The *Harris* court concluded that such a demand was inconsistent with the "flexible, common-sense standard" of probable cause. *See Illinois v. Gates*, 462 U.S. 213, 239 (1983).

In this case, Lepra performed satisfactorily in every area of testing on every occasion. Border Patrol certified Lepra as reliable and Lepra maintained her satisfactory performance on an ongoing and regular basis. Def. Exs. C-N. Agent Bobo personally judged Lepra and Agent Caruthers on a number of occasions and opined that Lepra's alert was reliable.

Meanwhile, Nicely opined that Lepra's alert was not reliable. Nicely admitted

---

[3] In this case, the Government submitted redacted canine biweekly log records for the Court's review. Following in camera inspection, the Court balanced the Defendant's right to the records with law enforcement concerns and approved a number of redactions but directed that other redactions be removed. In addition, during the suppression hearing, the Court conducted an in camera hearing with Agent Bobo and the assigned AUSA to further address the redacted information. *Cf. United States v. Thomas*, 726 F.3d 1086 (9th Cir. 2013) (canine biweekly logs redacted without in camera inspection of unredacted logs required reversal).

that his opinion was made in spite of the fact that he never saw, trained or observed Lepra in training or in the field. In addition, Nicely never observed Agent Caruthers to determine whether he was prone to cueing and never observed Lepra and Agent Caruthers working together. Nonetheless Nicely testified that Lepra was cued or prompted by Agent Caruthers. This opinion was based in large part on the Lit study regarding canine handler cueing of detector canines. The Court notes that Nicely's behavioral science approach has not been adopted by the courts or law enforcement community as a recognized method or the standard for analyzing the reliability of drug-detection canines. Ultimately, the Court finds that Nicely's opinion lacks a sufficient foundation to challenge the reliability of Lepra's alert. As such, Garcia has failed to demonstrate that Lepra was not reliable.

The Court concludes that Lepra was certified by a bona fide organization after satisfactorily performing in a certification or training program which tested her reliability in a controlled setting. To the extent that Lepra was not shown to be perfect, the Court observes that even reliable detector dogs are not infallible. The *Caballes* court referenced statistical evidence that proved a reliable dog that alerts hundreds of times will be wrong dozens of times, keeping in mind that the mere fact that drugs were not recovered does not prove that trace amounts of drugs were in the vehicle. 543 U.S. 411-12. While recognizing that drug detecting canines may err, the *Harris* court recognized that "law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources." 133 S. Ct. at 1057. The Court finds there is no question that Lepra's performance was substantially higher than the average canine and that her alert was reliable.

**4. Probable Cause to Arrest Garcia Arose Following the Canine Alert**

Garcia argues that he was unlawfully arrested at the stop site following the canine alert. Meanwhile, the Government contends that Garcia was not arrested until

1   the methamphetamine was discovered at the Temecula checkpoint.

2          The Court finds it unnecessary to decide whether the arrest occurred by the

3   roadside or at the checkpoint because probable cause to arrest Garcia arose when Lepra

4   alerted to the presence of drugs at the traffic stop site. An alert by a certified, reliable

5   narcotics detector dog, with nothing more, is sufficient to establish probable cause to

6   arrest. *United States v. Cedano-Arellano*, 332 F.3d 568, 573 (9th Cir. 2003) Garcia

7   argues that *Cedano-Arellano* merely repeated settled law that a canine alert provides

8   probable cause to search, not arrest. Garcia's reading of *Cedano-Arrellano* ignores the

9   clear holding of the case. In *Cedano-Arellano*, defendant maintained that, following

10  a drug detecting canine alert on his vehicle, the agents did not have probable cause to

11  arrest him. *Id*. The Ninth Circuit disagreed and found that an alert by a certified,

12  reliable narcotics detector dog was sufficient even by itself to support probable cause

13  to arrest the defendant. *Id*.

14         Here, in addition to the canine alert, Agent Caruthers developed additional facts

15  which indicated Garcia knew drugs were in his vehicle. Garcia's erratic driving and

16  Garcia's border crossing history, coupled with the canine alert, established probable

17  cause to conclude that Garcia was transporting drugs.

18  **5. Garcia Consented to the Search of his Cellular Phone**

19         Garcia argues that: (1) his cell phone was illegally seized at the checkpoint, and

20  (2) he did not consent to the search of the phone. The Court finds that the cell phone

21  was legally seized, was accessed prior to consent being requested, and that consent to

22  search the contents of the phone was given. In the event that consent was lacking, the

23  Court finds that the search warrant for the cell phone cures any taint from the access

24  of the phone on the day of Garcia's arrest.

25         First, the evidence reveals that Garcia's cell phone was taken from him at the

26  checkpoint after the canine alert but prior to the discovery of the methamphetamine

27  concealed in the vehicle. Given that probable cause to arrest Garcia existed at the time

28  of the canine alert, the seizure of the cell phone (but not the search) was justified as

incident to Garcia's arrest. In addition, given the existence of probable cause to arrest Garcia, it was reasonable to seize the cell phone to prevent the destruction of evidence. *See Riley v. California*, 134 S. Ct. 2473, 2486 (2014); *United States v. Place*, 462 U.S. 696, 706 (1983) (temporary seizure of luggage based on reasonable suspicion).

Second, accessing the contents of the cell phone constitutes a search requiring a search warrant or an exception to the warrant requirement. *Riley*, 134 S. Ct. at 2493 (a warrant is generally required before conducting a search for the contents of a cell phone, even when the cell phone is seized incident to arrest). A warrantless search is unconstitutional unless the government demonstrates that it "fall[s] within certain established and well-defined exceptions to the warrant clause." *United States v. Murphy*, 516 F.3d 1117, 1120 (9th Cir.2008) (quoting *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1298 (9th Cir.1988)). Consent constitutes one such exception: "[A warrantless] search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The government bears the burden of proving that consent was voluntary. *United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2003). Whether consent to search was voluntarily given is "to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. The Court considers five factors in determining voluntariness: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that he had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002) (citing *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir.1989) (distilling from the case law the five factors now widely used). No one factor is determinative in the equation. *Id*.

Garcia argues that four of the five factors weigh in favor of a finding that consent was lacking. Garcia's challenge also relies on the claims that his cell phone had been illegally accessed and that Agent Perez reportedly told Garcia that he was screwed

based on the evidence on the phone prior to being asked for consent.

The Government did not offer any evidence to rebut Garcia's claims that he was asked for the cell phone's password by an officer; that an officer was using the phone before consent was requested; and that Garcia was told he was screwed with the information contained on the phone.[4] The Court finds that Garcia's unrebutted claims weigh against a finding of consent. As to the traditional *Castillo* factors, the Court finds that Garcia was under arrest at the time that he was asked to consent to a search of the phone and Miranda warnings had not been given at this time. However, Garcia was advised of his right not to consent to a search of the phone. Def. Mot. Ex. B. None of the arresting officers had their weapons drawn and Garcia had not been told that a search warrant could be obtained.

The Consent to Search Cellular Telephone was in the English language and read to Garcia in the English language at 1:20 p.m. It specifically provided that Garcia had the constitutional right to refuse consent to a search of the memory of the cell phone. It also provided that authorization to search was given voluntarily and without threats, promises, pressure or coercion of any kind.

As noted herein above, the Court finds that Garcia was sufficiently fluent in the English language so as to understand what rights were being waived and what was being authorized. Based on the totality of the circumstances, the Cour finds that Garcia knowingly and voluntarily consented to the search of the cell phone.

**A. If Consent Was Lacking, the Fruits of the Search are Admissible**

If Garcia did not freely and voluntarily consent to the search of the cell phone memory, the evidence subsequently obtained pursuant to a valid search warrant is admissible under the independent source doctrine. *See Nix v. Williams*, 467 U.S. 431, 433 (1984) (independent source doctrine permits admission of evidence discovered by

---

[4]Agent U. Perez did testify that he did not make contact with Garcia until Garcia was interviewed at 2 p.m. However, no evidence was introduced disputing Garcia's claims as to any of the other processing agents, including Agent M. Perez.

1  means wholly independent of a constitutional violation).

2  In his affidavit in support of the search warrant, Agent U. Perez states that as a

3  result of the Garcia's consent to search cell phone, Agent Beretta made a cursory search

4  of the phone but did not detail what he found in the phone. Govt. Mot. Ex. 3 at 115.

5  In *United States v. Valdes-Valencia*, 811 F.2d 1232, 1237 (9th Cir. 1987), law

6  enforcement officers made an illegal sweep of premises while search warrants for the

7  premises were being sought. The court held that suppression of the evidence obtained

8  through the valid search warrant was not required where evidence legitimately obtained

9  supported the search warrants and observations made during the illegal sweep were not

10  used in obtaining the warrants. *Id*. In this case, the affidavit made no reference to any

11  search of the cell phone either before consent was given or afterwards. Agent U. Perez

12  declared that he was not even aware that other agents may have accessed the cell phone

13  and observed any incriminating evidence from the cell phone. Govt. Mot. Ex. 4; *cf.*

14  *United States v. Aguilera*, No. 12-10441, 2014 WL 4116979, at *2 (9th Cir. Aug. 22,

15  2014) (issuance of search warrants and subsequent search of cell phone, which did not

16  rely on any information gleaned from illegal data search, fell under the independent

17  source exception and search did not violate *Riley*). The Court concludes that all of the

18  evidence which supported the search warrant was obtained legitimately, and the

19  independent source doctrine permits the admission of evidence obtained from the

20  search warrant.

21  **6. Garcia Received Miranda Warnings and Provided Voluntary Statements**

22  Lastly, Garcia filed a motion to suppress his statements based upon the

23  government's failure to show compliance with *Miranda v. Arizona*, 384 U.S. 436

24  (1966), and failing to demonstrate that the post-arrest statements were voluntary as

25  required by 18 U.S.C. § 3501.

26  At the suppression hearing, Agent U. Perez testified that he interviewed Garcia

27  following Miranda advisement in the Spanish language. At the hearing, the

28  Government introduced into evidence an I-214 Spanish form signed by Garcia and

advising him of his Miranda rights. Govt. Ex. 6. In addition, the Government provided a translation of the form from the Spanish to English language. Govt. Ex. 6a. The Court finds that Agent U. Perez reviewed Garcia's Miranda rights with him in the Spanish language, that Garcia understood his rights and that Garcia waived his Miranda rights and made a statement that was voluntary.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendant Garcia's Motions to Suppress.

IT IS SO ORDERED.

DATED:  December 16, 2014

HON. GONZALO P. CURIEL
United States District Judge

14-cr-2141-GPC